**FILED**
**CLERK**

2:56 pm, Jan 09, 2018

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X

ROBERT BOSTON,

                      Plaintiff,

           -against-

SUFFOLK COUNTY, NEW YORK, SUFFOLK
COUNTY POLICE DEPARTMENT, TOWN
OF SMITHTOWN, NEW YORK, TOWN OF
SMITHTOWN PARK POLICE, SUFFOLK
COUNTY POLICE OFFICERS *JOHN DOE #1*
*TO JOHN DOE #5,* TOWN OF SMITHTOWN
DEPARTMENT OF PUBLIC SAFETY
PERSONNEL AND/OR PARK RANGERS
*JOHN DOE #1 TO JOHN DOE #5*

                   Defendants.

--------------------------------------------------------X

**MEMORANDUM OF**
**DECISION & ORDER**
14-cv-5791 (ADS) (AKT)

**APPEARANCES:**

**Brill Legal Group, P.C.**
*Attorneys for the Plaintiff*
233 Broadway
Suite 2340
New York, NY 10279
      By:    Peter E. Brill, Esq.,
              Joseph P. Griffin, Esq., Of Counsel

**Suffolk County Department of Law**
*Corporation Counsel for the Defendants Suffolk County, New York and Suffolk County Police*
*Department*
H. Lee Dennison Building
100 Veterans Memorial Highway
PO Box 6100
Hauppauge, NY 11788
      By:    Kyle O Wood, Assistant Corporation Counsel
              Susan A. Flynn, Assistant Corporation Counsel

**Law Office of Stanley E. Orzechowski P.C.**
*Attorney for the Defendants Town of Smithton, New York and Town of Smithtown Park Police*
38 Southern Boulevard
Nesconset, NY 11767
      By:    Stanley E. Orzechowski, Esq., Of Counsel

**SPATT, District Judge**:

The Plaintiff Robert Boston (the "Plaintiff") brought this civil rights action against the Defendants Suffolk County, New York (the "County" or "Suffolk"), Suffolk County Police Department (the "SCPD") (with the County, the "Suffolk Defendants"), Town Of Smithtown, New York (the "Town" or "Smithtown"), Town Of Smithtown Park Police ("TSPP") (with Smithtown, the "Smithtown Defendants"), Suffolk County Police Officers John Doe #1 To John Doe #5, Town Of Smithtown Department Of Public Safety Personnel and/or Park Rangers John Doe #1 To John Doe #5 (together with the SCPD John Does 1 through 5, the "John Doe defendants") (collectively, the "Defendants") alleging that they deprived him of his constitutional rights by failing to provide him with medical care while in their custody.

Presently before the Court are motions by the Suffolk Defendants and the Smithtown Defendants for summary judgment pursuant to Federal Rule of Civil Procedure ("Fᴇᴅ. R. Cɪᴠ. P." or "Rule") 56, as well as a motion by the Plaintiff to amend his complaint pursuant to Rule 15 to substitute certain police officers and rangers for the John Doe defendants.

For the following reasons, the Plaintiff's motion to amend pursuant to Rule 15 is denied, and the Defendants' motions for summary judgment are granted in part, and denied in part.

## I. BACKGROUND

### A. The Relevant Facts

On the afternoon of July 4, 2013, the Plaintiff left his home after having a dispute with his wife. He brought nine tablets of Valium and 35 tablets of Wellbutrin with him. The Plaintiff

testified that he does not remember where he went, but that he drove past his wife at some point, and ended up in Bill Richards Memorial Park in Smithtown, New York. (Dep. of Robert Boston at 47–48). While at the park, he smoked some marijuana, and swallowed nine Valium pills and an unknown quantity of Wellbutrin. He wanted to kill himself. The next thing that the Plaintiff remembers is being asked to sign a desk appearance ticket at a police station on July 5, 2013.

At about 10:19 in the morning on July 5, 2013, Town of Smithtown Park Rangers Russell Sokol ("Ranger Sokol" or "Sokol") and Joseph Paterson ("Ranger Paterson" or "Paterson") received a radio report of an individual who was on the premises without authorization. Paterson testified that there was a radio call for a suspicion person around a vehicle, who was possibly intoxicated. (Dep. of Sokol at 35).

Paterson and Sokol encountered the Plaintiff at about 10:50 a.m.. The Plaintiff "appeared to be . . . sleeping." (*Id.* at 37). The rangers awakened the Plaintiff and asked him for identification. The Plaintiff refused. He told the officers that he did not want to come out of the car because he believed they were going to arrest him. (*Id.* at 39). Ranger Paterson testified that the Plaintiff said that he wanted to be left alone so that he could sleep. (Dep. of Paterson at 36).

The rangers eventually convinced the Plaintiff to exit his car, and he did so without any aid from the rangers. (Dep. of Sokol at 40–41). He said that he did not know why the rangers were bothering him; he was just sleeping and did not see any problem. (Dep. of Paterson at 37). The Plaintiff cursed at the rangers and used other abusive and offensive language. (Dep. of Sokol at 45–46). The Plaintiff identified himself and the rangers took down his information. (*Id.* at 47).

The Plaintiff was a little unsteady on his feet, but was coherent and able to answer the officers' questions. He told the rangers that he had taken two tabs of acid and nine Diazepam pills, and that he had smoked a little weed. Rangers Sokol and Paterson had the Plaintiff sit down and

asked him if he needed any medical attention or if he wanted to go to the hospital. The Plaintiff said no. (*Id.* at 43). Ranger Paterson asked him a series of question to assess his well-being: he asked him the name of the current president; what the weather was that day; what was the day of the week; and the current date. (Dep. of Paterson at 38). Paterson testified that he "got responses that were exactly what [he] had asked. There was no waivering [sic]. There was nothing that arose suspicion. It just seemed like he was just very tired." (Dep. of Paterson at 39).

The rangers observed several pills lying on the passenger floor, and the Plaintiff told them that he also had weed. Rangers Sokol and Paterson recovered a quantity of marijuana from the Plaintiff's person. Paterson observed some dried vomit on the passenger seat of the Plaintiff's car. (*Id.* at 49). The Plaintiff later supported this point by testifying that he had to clean vomit out of his car.

The Plaintiff was placed under arrest. The Plaintiff was arrested for possession of marijuana; possession of a controlled substance; remaining upon Town Park Property while under the influence of non-prescription controlled substances; use of loud, abusive and indecent language on park property; and failure to show identification upon request.

Rangers Sokol and Paterson transported the Plaintiff to the Suffolk County Police Fourth Precinct (the "Fourth Precinct") for processing. While he was transporting the Plaintiff, Ranger Paterson explained the process at the precinct, and the Plaintiff seemed coherent. (Dep. of Paterson at 50).

At 10:55 a.m., the Plaintiff arrived at the Fourth Precinct. The Plaintiff walked into the precinct without any assistance. The desk sergeant asked the Plaintiff a series of questions: whether he needed medical attention; whether he was okay; whether he was taking any medication;

and what was his pedigree information. The Plaintiff answered all of these questions, and stated that he did not need medical attention.

Sergeant Thomas Healy ("Sergeant Healy" or "Healy") of the SCPD was the desk officer at that time. He testified that he had no independent recollection of interacting with the Plaintiff. However, on the Prisoner Activity Log, Healy wrote "No" in the section that asks whether the "prisoner claims pain, injury or illness." (Prisoner Activity Log, Suffolk Defs. Ex. J). Healy also noted that the Plaintiff was unsteady on his feet, lethargic, and spoke with slurred speech.

Healy did not recall a prisoner ever failing to give a response to his questioning concerning injury or illness. He does not remember the Plaintiff ever making any statements about attempting to take his life; and testified that he would have noted such statements if they had been made, and would have sent the prisoner to the hospital. Healy testified that if a prisoner asks for medical attention, the officer to whom the request was made would bring that request to the desk sergeant's attention. While he has no independent recollection, Healy testified that the records reflect that the Plaintiff did not request medical attention while housed at the Fourth Precinct. Although Healy does not remember it, Ranger Paterson testified that he told him that the Plaintiff claimed to have ingested nine diazepam and two tabs of acid. (Paterson Dep. at 60).

The prisoner activity log shows that the Plaintiff was in custody at the Fourth Precinct from 10:55 a.m. until 3:20 p.m.. The officers noted in the activity log that the Plaintiff was calm the entire time. At three different times, he took drinks of water. At 12:03 p.m., Ranger Paterson remarked on the log that the Plaintiff was "cooperative." At 3:20 p.m., the Plaintiff signed a desk appearance ticket. The Plaintiff testified that he remembered signing the desk appearance ticket. (Dep. of Robert Boston at 63–66).

After issuing the Plaintiff a desk appearance ticket, Ranger Paterson sought to bring the Plaintiff home. He did not want the Plaintiff to drive because he was very tired, but he did not want him housed overnight at another precinct because the Plaintiff had been cooperative. (Dep. of Paterson at 71). The Plaintiff had provided the officers with his home phone number, but he had told them that no one was home. Paterson asked the Plaintiff if he would rather go to a jail cell or go home and get some sleep. The Plaintiff told Paterson that he wanted to go home; specifically, he said he was tired and wanted to go to bed. (Dep. of Paterson at 75).

While he was at the Fourth Precinct, the Plaintiff never requested medical attention; never complained of any injury or illness; and never disclosed that he had attempted suicide.

Ranger Paterson drove the Plaintiff home, and Ranger Sokol followed in a separate car. Paterson parked in the driveway. He asked the Plaintiff whose cars were in the driveway, and the Plaintiff told him that the two cars belonged to him and his wife. The Plaintiff further stated that he had thought his wife was still at work, and asked Ranger Paterson to go speak with her if she was home. The Plaintiff remained in the car. The car was running, the air conditioning was on, and the windows were cracked. (Dep. of Sokol at 92).

Ranger Paterson spoke to the Plaintiff's wife, Joann Boston. He explained to her what happened, and she said that she would not let him into the house. The Plaintiff's daughter, Kayla Boston, ran out of the house to where her father was, and yelled at him, saying that she hated him. The car door was open, and she pulled it open more to yell at him. Ranger Sokol came around to prevent Kayla Boston from opening the door all the way. Kayla Boston testified by deposition that her father did not respond. She said that "he wasn't [her] dad at that moment. He was looking at [her], but like he was looking through [her] [] like [she] was a stranger . . . ." (Dep. of Kayla

Boston at 92). She ran back inside. She testified that she did not know if he was in need of medical attention or in distress at that point. (*Id.* at 160).

About that time Joann Boston walked outside, and saw the Plaintiff in the car. She went to tell him that his mother was coming to get him. Joann Boston testified that the Plaintiff:

> was sitting in the back [of the car] and he was tipped over[,] and his eyes were like blank. They looked like dead eyes. They weren't his eyes. And he seemed pale and sweaty. And he was tipped over. And I tried to talk to him. I said, are you okay? And I couldn't get him – he wouldn't even respond to me. So I said to the officer – I said, he doesn't need to sleep it off under the tree, he needs an ambulance, he needs to go to the hospital. And he said, well you can call 911 if you want.

(Dep. of Joann Boston at 92). She went inside and called 911. The Plaintiff suffered a seizure at that point. An ambulance arrived and took the Plaintiff to St. Catherine's Hospital. The Plaintiff was in a coma for six days. He has been diagnosed with post-traumatic stress disorder; has lost most of his sense of smell; has lost many fine motor senses; and does not see as well as he used to.

Prior to these events, the Plaintiff had never suffered a drug induced seizure despite having taken many drugs over the course of many years.

Relevant here, the officers also testified as to their respective training. Ranger Sokol testified that he had never received any training in the signs and symptoms of narcotic use, (Sokol Dep. at 23), and that there are no specific regulations as to how to deal with someone in medical distress, (*id.* at 28). Ranger Paterson testified that he did not receive any training with regard to the use of drugs, (Paterson Dep. at 16–17), the identification of drugs, (*id.*), or how to interact with arrestees, (*id.* at 20–21). He testified, however, that he was trained in the administration of Narcan, (*id.* at 17), which is a medication that blocks the effects of opioids, especially in overdose. Sergeant Healy testified that he did not receive any training on how drugs might affect people. (Dep. of Healy at 18).

**B. The Relevant Procedural Background**

On October 1, 2013, the Plaintiff served an unverified Notice of Claim on the Town of Smithtown and Suffolk County. On November 8, 2013, the Plaintiff served an amended verified Notice of Claim on the Town of Smithtown and Suffolk County.

On October 3, 2014, the Plaintiff filed his complaint. The Plaintiff alleges that the Defendants deprived him of his Fourteenth Amendment rights in violation of 42 U.S.C. § 1983. The 1983 claims are brought against the SCPD, the TSPP, and the John Doe defendants, and the Plaintiff brings *Monell* claims against the County and the Town. The Plaintiff also brings causes of action for negligence against all of the Defendants, and vicarious liability against the County and the Town. The complaint seeks compensatory and punitive damages.

On June 23, 2017, the Suffolk Defendants and the Smithtown Defendants filed their respective motions for summary judgment pursuant to Rule 56.

On August 4, 2017, the Plaintiff filed his motion to amend the complaint pursuant to Rule 15.

## II. DISCUSSION

**A. As to the Plaintiff's Motion to Amend**

**1. Rule 15(c)(1)(C)**

The Plaintiff seeks to amend his complaint pursuant to Rule 15(c)(1)(C) to substitute certain officers for John Doe defendants. The Defendants argue that the statute of limitations has passed, and Rule 15(c)(1)(C) does not permit relation back in this situation where there was no mistake of identity. The Court finds that the Plaintiff cannot avail himself of the provisions of Rule 15(c)(1)(C).

"Rule 15(c)(1)(C) provides the federal standard for relation back." *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013). An amended complaint that adds a new party must meet the following criteria to relate back under Rule 15(c)(1)(C):

> (1) the claim must have arisen out of conduct set out in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party should have known that, *but for a mistake of identity*, the original action would have been brought against it; and (4) the second and third criteria are fulfilled within 120 days of the filing of the original complaint, and the original complaint was filed within the limitations period.

*Id.* (quoting *Barrow v. Wethersfield Police Dep't,* 66 F.3d 466, 468–69 (2d Cir. 1995) (internal alterations omitted, emphasis in original)). However, the Second Circuit has said that "that the lack of knowledge of a John Doe defendant's name does not constitute a mistake of identity." *Id.* at 518 (internal citations and quotation marks omitted).

"'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued." *Barrow*, 66 F.3d at 468.

Therefore, because the Second Circuit has explicitly held that "lack of knowledge of a John Doe defendant's name does not constitute a 'mistake of identity,'" *Hogan*, 738 F.3d at 517, the Plaintiff cannot avail himself of Rule 15(c)(1)(C). *See Parker v. New York State Div. of Parole*, No. 04-CV-03901, 2017 WL 3600420, at *4 (S.D.N.Y. Aug. 18, 2017) ("Because Rule 15(c)(1)(C) cannot be used to save claims that are untimely due to a lack of knowledge, plaintiff's claims against Cieslak and DiBenedetto do not relate back to his original complaint under the federal relation back doctrine."); *Doe v. New York*, 97 F. Supp. 3d 5, 18 (E.D.N.Y. 2015) (finding that the plaintiff could not avail himself of Rule 15(c)(1)(C) where he had brought claims against John Doe defendants because "lack of knowledge of a John Doe defendant's name does not constitute

a mistake of identity" (quoting Hogan, 738 F.3d at 517)); *Ceara v. Deacon,* 68 F. Supp. 3d 402, 407, (S.D.N.Y. 2014) (concluding that the plaintiff's claims did not relate back under Rule 15(c)(1)(C) because the plaintiff was "ignorant" and not "mistaken" about the John Doe defendants' identities); *Strada v. City of New York,* No. 11–CV–5735 (MKB), 2014 WL 3490306, at *10 (E.D.N.Y. July 11, 2014) (citing *Hogan* and explaining that "*Barrow* remains good law . . . and precludes [the] [c]ourt from finding that [the] [p]laintiff's failure to amend the [c]omplaint to name the individual officers was a mistake contemplated by Rule 15(c)").

Contrary to the Plaintiff's arguments, *Barrow* is still the law of the Second Circuit. *See, e.g., DaCosta v. City of New York*, No. 15-CV-5174, 2017 WL 5176409, at *16 (E.D.N.Y. Nov. 8, 2017) ("[T]he Court of Appeals for the Second Circuit has not yet abandoned the *Barrow* rule."). In fact, in *Hogan*, the Court cited *Barrow* as precedent when it held that Rule 15(c)(1)(C) did not allow for relation back where the plaintiff was ignorant of the identities of the John Doe defendants. *Hogan*, 738 F.3d at 517–18.

More importantly, the Plaintiff has not supplied a proposed amended complaint, and did not mention once in his motion which officers he sought to substitute for the John Does. The Defendants and the Court are left to speculate as to which officers the Plaintiff seeks to substitute. It is not clear whether the Plaintiff seeks to substitute certain officers in their individual capacities, their official capacities, or both. This is an insufficient showing, and sufficient reason to summarily deny the Plaintiff's motion to amend his complaint pursuant to Rule 15. *See Christian v. Town of Riga*, 649 F. Supp. 2d 84, 100 (W.D.N.Y. 2009) ("Usually, a movant's failure to submit a proposed amended complaint constitutes sufficient grounds to deny a motion to amend." (citing *Murray v. N.Y.*, 604 F. Supp. 2d 581, 588 (W.D.N.Y. 2009)); *La Barbera v. Ferran Enterprises, Inc.,* No. 06-cv-2678, 2009 WL 367611, at *3 (E.D.N.Y. Feb. 10, 2009) ("In order to meet the

requirements of particularity in a motion to amend, a complete copy of the proposed amended complaint must accompany the motion so that both the Court and the opposing party can understand the exact changes sought.") (internal citations and quotation marks omitted); *Team Air Express, Inc. v. A. Heffco Technologies, Inc.,* No. 06-cv-2742, 2008 WL 3165892, at *10 n.10 (E.D.N.Y. Aug. 6, 2008) (stating that "the Court could recommend denial of the motion [for leave to amend] solely on the basis of plaintiff's failure to submit a proposed amended Complaint"); *Zito v. Leasecomm Corp.,* No. 02-cv-8074, 2004 WL 2211650, at *25 (S.D.N.Y. Sept. 30, 2004) ("In order to meet the requirements of particularity in a motion to amend, 'a complete copy of the proposed amended complaint must accompany the motion so that both the Court and opposing parties can understand the exact changes sought.'" (quoting *Smith v. Planas,* 151 F.R.D. 547, 550 (S.D.N.Y. 1993))).

While it is true that a Court may grant a motion to amend based solely on the moving papers where the "papers adequately explain the basis for, and nature of, the proposed amendment," *Murray*, 604 F. Supp. 2d at 588 (citing *Segatt v. GSI Holding Corp.*, No. 07 CIV. 11413 (WHP), 2008 WL 4865033, at *4 (S.D.N.Y. Nov. 3, 2008)), the Plaintiff did not adequately explain the nature of the proposed amendment. That is, he did not say which officers he seeks to substitute. The Smithtown Defendants assumed that the Plaintiff sought to substitute Sokol and Paterson. The Court cannot engage in such conjecture.

In any event, as stated above, even if the Plaintiff had named certain officers, he would not be able to avail himself of Rule 15(c)(1)(C).

Therefore, the Plaintiff's motion to amend his complaint pursuant to Rule 15(c)(1)(C) is denied.

## 2. N.Y. C.P.L.R. § 1024.

While the Plaintiff did not raise the issue, in an abundance of caution, the Court will also examine whether the Plaintiff would be permitted to substitute certain police officers for the John Doe Defendants under N.Y. C.P.L.R. §1024 ("Section 1024").

The Second Circuit has held that even where a plaintiff's claims do not relate back under Rule 15(c)(1)(C), "Rule 15(c)(1)(A) permits an amended pleading to relate back when 'the law that provides the applicable statute of limitations allows relation back.'" *Hogan*, 738 F.3d at 518 (quoting FED. R. CIV. P. 15(c)(1)(A)); *see also* FED. R. CIV. P. 15(c)(1)(A) (stating that "[a]n amendment . . . relates back . . . when the law that provides the applicable statute of limitations allows relation back"). That is, Rule 15 "does not apply to preclude any relation back that may be permitted under the applicable limitations law." *Id.* "Rule 15(c)(1)(A) instructs courts, then, to look to the entire *body* of limitations law that provides the applicable statute of limitations." *Id.* (emphasis in original).

New York State law "provides a more forgiving principle of relation back in the John Doe context, compared to the federal relation back doctrine under Rule 15(c)(1)(C). *Id.* Here, the applicable limitations law is Section 1024 of the N.Y. C.P.L.R., which states:

> A party who is ignorant, in whole or in part, of the name or identity of a person who may properly be made a party, may proceed against such person as an unknown party by designating so much of his name and identity as is known. If the name or remainder of the name becomes known all subsequent proceedings shall be taken under the true name and all prior proceedings shall be deemed amended accordingly.

N.Y. C.P.L.R. § 1024.

Under Section 1024 of the N.Y. C.P.L.R., a court may allow a plaintiff to substitute a named party for a John Doe party if the plaintiff meets two requirements: (1) "'exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name,'"

and (2) "describe the John Doe party 'in such form as will fairly apprise the party that [he] is the intended defendant. " *Hogan*, 738 F.3d at 518–19 (quoting *Bumpus v. N.Y.C. Transit Auth.*, 66 A.D.3d 26, 883 N.Y.S.2d 99, 104 (N.Y. 2009)). A plaintiff must then "ascertain the identity of unknown 'Jane Doe' parties, and . . . serve process upon them, within 120 days from filing." *Bumpus*, 66 A.D.3d at 31, 883 N.Y.S.2d at 105; see also *JCG v. Ercole,* No. 11–CV6844, 2014 WL 1630815, at * 13 (S.D.N.Y. Apr. 24, 2014) ("If a plaintiff fulfills these conditions, he 'must then ascertain the identity of unknown [John] Doe parties, and . . . serve process upon them, within 120 days from filing [the original complaint].'" (alterations in original) (quoting *Williams v. United States,* No. 07–CV–3018, 2010 WL 963474, at * 12 (S.D.N.Y. Feb. 25, 2010))). The 120-day deadline imposed by C.P.L.R. 305-b may be extended "upon good cause shown or in the interest of justice." N.Y. C.P.L.R. 305-b.

"To identify unknown parties after filing, a plaintiff is advised to serve discovery demands upon any known parties, seek disclosures pursuant to a Freedom of Information Law ("FOIL") request, or otherwise act with diligence." *Williams*, 2010 WL 963474, at *12 (citing *Bumpus,* 66 A.D.3d at 33–34, 883 N .Y.S.2d at 107).

Here, the Court finds that the Plaintiff did not act with due diligence. Assuming for the purposes of this analysis that the Plaintiff seeks to substitute Healy, Sokol and Paterson for the John Doe Defendants, the Plaintiff knew their identities years ago, yet failed to serve process upon them.

In New York, the statute of limitations for claims brought pursuant to Section 1983 is three years. *Morales v. Cty. of Suffolk*, 952 F. Supp. 2d 433, 436 (E.D.N.Y. 2013) (Spatt, J.) (citing *Patterson v. Cty. of Oneida,* 375 F.3d 206, 225 (2d Cir. 2004)). The Plaintiff alleges that his rights were violated as late as July 5, 2013. The complaint was filed on October 3, 2013. The Plaintiff

moved to amend his complaint on August 4, 2017, more than four years after the incident. Healy

testified by deposition on November 6, 2015. Counsel for the Plaintiff was present, and questioned

Healy. Sokol was deposed on November 25, 2015. Counsel for the Plaintiff was present, and

questioned Sokol. Paterson was deposed on December 22, 2015. Counsel for the Plaintiff was

present, and questioned Paterson. Furthermore, counsel for the Smithtown Defendants submitted

an affidavit stating that the Plaintiff possessed the arrest records and prosecution records, which

contained Healy, Sokol, and Paterson's names, no later than February 12, 2014, because counsel

for the Plaintiff produced those records at the GEN. MUN. LAW § 50-E ("Section 50-E") hearing.

The Plaintiff cannot avail himself of the benefits of § 1024 where it is clear that he had the

names of Sergeant Healy, Ranger Sokol and Ranger Paterson before the statute of limitations had

run. The Plaintiff had the names of the officers before the statute of limitations expired, yet made

no attempt to amend his complaint or serve them. He did not move to amend his complaint until

more than three years after he produced documents with their names at the Section 50-E hearing,

and a year and a half after he deposed the officers.

"Here, Defendants provided Plaintiff with the names of the officers involved in Plaintiff's

arrest prior to the expiration of the statute of limitations and close of discovery, yet Plaintiff did

not attempt to amend the Complaint to add any individual officers prior to the expiration of the

statute of limitations." *Strada*, 2014 WL 3490306, at *6.

While this may be a harsh result, it is mandated by the case law interpreting N.Y. C.P.L.R.

§ 1024. *See Gonzalez v. City of N.Y.*, No. 14 CIV. 7721 LGS, 2015 WL 6873451, at *3 (S.D.N.Y.

Nov. 9, 2015) ("Where, as here, nothing in the record indicates that Plaintiff exercised due

diligence before the statute of limitations expired, she may not use the 'John Doe' procedure in §

1024." (citing *Temple v. N.Y. Cmty. Hosp. of Brooklyn,* 89 A.D.3d 926, 933 N.Y.S.2d 321, 322

(N.Y. App. Div. 2011) ("To make use of the 'John Doe' procedure delineated in C.P.L.R. 1024, parties must demonstrate that they have exercised due diligence . . . ."))); *Vasconcellos v. City of N.Y.,* No. 12 Civ. 8445, 2014 WL 4961441, at *9 (S.D.N.Y. Oct. 2, 2014) ("[I]n order to invoke C.P.L.R. § 1024's benefits, [plaintiff] must first show that she exercise[d] due diligence, prior to the running of the statute of limitations, to identify the defendant[s] by name.") (internal citations and quotation marks omitted)).

"The use of C.P.L.R. 1024 presents many pitfalls. One pitfall is that parties are not to resort to the 'Jane Doe' procedure unless they exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name and, despite such efforts, *are unable to do so.*" *Bumpus,* 66 A.D.3d at 29–30, 883 N.Y.S.2d at 104 (emphasis added). The Plaintiff did not exercise due diligence prior to the running of the statute of limitations, and has thus fallen into one of the pitfalls of Section 1024.

Therefore, the Plaintiff cannot avail himself of Section 1024, and his motion to amend his complaint pursuant to Rule 15 to substitute certain officers for the John Doe defendants is denied.

## B. As to the Defendants' Motions for Summary Judgment

### 1. The Legal Standard

Under FED. R. CIV. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When deciding a motion for summary judgment, "[t]he Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non–moving party.'" *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1998)).

"[A]t the summary judgment stage the judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 173–74 (2d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986) (internal quotation marks omitted)). In other words, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Barrows v. Seneca Foods Corp.,* 512 F. App'x 115, 117 (2d Cir. 2013) (quoting *Redd,* 678 F.3d at 174 (internal quotation marks omitted)). The Court should not attempt to resolve issues of fact, but rather "assess whether there are any factual issues to be tried." *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.,* 677 F.3d 109, 119 (2d Cir. 2012).

The movant has the burden of demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). If a nonmoving party fails to make a sufficient showing on an essential element of their case where they will have the burden of proof, then summary judgment is appropriate. *Id.* at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. *Liberty Lobby,* 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for that party. *See Dawson v. Cty. of Westchester,* 373 F.3d 265, 272 (2d Cir. 2004).

### 2. The Applicable Law

#### a. Section 1983 Generally

42 U.S.C. § 1983 provides, in relevant part, that "any person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to

be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, is liable to the injured party for damages."

To state a § 1983 claim, a plaintiff must allege: (1) that the challenged conduct was "committed by a person acting under color of state law"; and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)). Section 1983 does not create any independent substantive right, but rather is a vehicle to "redress . . . the deprivation of [federal] rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999); *see also Rosa R. v. Connelly*, 889 F.2d 435, 440 (2d Cir. 1989) ("It is fundamental, however, that § 1983 creates no independent, substantive constitutional rights but rather is a vehicle for enforcing such rights.").

### b. 1983 Claims Against Municipalities, namely, "*Monell* Claims"

It is well-established that "a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 2037, 56 L. Ed. 2d 611 (1978). However, section 1983 "extends liability to a municipal organization where . . . the policies or customs it has sanctioned, led to an independent constitutional violation." *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006). "Municipal liability may also be premised on a failure to train employees when inadequate training 'reflects deliberate indifference to . . . constitutional rights.'" *Okin v. Village of Cornwall–On–Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (quoting *City of Canton v. Harris*, 489 U.S. 378, 392, 109 S. Ct. 1197, 1206, 103 L. Ed. 2d 412 (1989)).

To prevail on a Section 1983 claim against a municipality, a plaintiff must show "that 'action pursuant to official municipal policy' caused the alleged constitutional injury." *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Connick v. Thompson*, 563 U.S. 51, 60, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011)); *see also Monell*, 436 U.S. at 690–91 ("[L]ocal governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels").

A plaintiff can establish the existence of a municipal policy or custom by showing:

> the existence of[] (1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision-making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge and acquiescence can be implied on the part of the policy making officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to deliberate indifference to the rights of those who come in contact with the municipal employees.

*Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996) (internal citations omitted).

Here, the Plaintiff argues that his *Monell* claims are premised upon an alleged failure to train. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. Only where a plaintiff can demonstrate that a municipality's failure to train "amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact" will a policy or custom actionable under Section 1983 be established. *Moray*, 924 F. Supp. at 12 (internal quotation marks omitted); *see also Connick*, 563 U.S. at 61–62; *Canton*, 489 U.S. at 388.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410, 117 S. Ct. 1382, 1391, 137 L. Ed. 2d 626 (1997). To establish deliberate

indifference, a plaintiff must demonstrate that: (1) "a policymaker knows to a moral certainty that her employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training . . . will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of N.Y.,* 974 F.2d 293, 297–98 (2d Cir. 1992) (internal quotation marks omitted). "[D]emonstration of deliberate indifference requires a showing that the official made a conscious choice, and was not merely negligent." *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012).

"[W]here . . . a city has a training program, a plaintiff must . . . 'identify a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." *Wray v. City of N.Y.*, 490 F.3d 189, 196 (2d Cir. 2007) (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004)). "The plaintiff must offer evidence to support the conclusion that the training program was inadequate, not '[t]hat a particular officer may be unsatisfactorily trained' or that 'an otherwise sound program has occasionally been negligently administered,' and that a 'hypothetically well-trained officer' would have avoided the constitutional violation." *Okin*, 577 F.3d at 440–41 (quoting *Canton*, 489 U.S. at 390–91); *see also Edrei v. City of N.Y.*, 254 F. Supp. 3d 565, 581 (finding that the plaintiffs plausibly alleged a failure-to-train claim where the City armed police officers with powerful long-range acoustic devices and placed those officers in "expectantly volatile protests" without training them).

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (internal citation and quotation marks omitted). This is because "[w]ithout notice that a

course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

At the same time, however, the Supreme Court in *Connick* reaffirmed the viability, in limited circumstances, of the "single-incident" theory of liability envisioned in the Court's prior *Canton* decision. *See id.* at 63–65; *Canton,* 489 U.S. at 390 n.10. Under the single-incident theory, a municipality can be found to be deliberately indifferent based on a single constitutional violation where "the unconstitutional consequences of failing to train [are] so patently obvious that a city should be liable under [Section] 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 64. Violation of constitutional rights must be a "highly predictable consequence" of the failure to train. *Id.* (internal quotation marks omitted). "Thus, deliberate indifference may be inferred where the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker failed to make meaningful efforts to address the risk of harm to plaintiffs." *Cash*, 654 F.3d at 334 (internal citations, quotation marks, and alterations omitted).

### c. Section 1983 Claims for Denial of Medical Care

While the Plaintiff has not named any individual defendants, the *Monell* claims are based on an alleged denial of medical care. Where a plaintiff was allegedly deprived of medical care, courts construe the rights seeking to be vindicated as arising under either the Eight Amendment prohibition against cruel and unusual punishment, *Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009), or the Fourteenth Amendment's Due Process Clause, *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). However, "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions . . . . [T]he State does not acquire the power to punish with which the Eighth

Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 2983, 77 L. Ed. 2d 605 (1983).

Instead, "[a] pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment." *Darnell*, 849 F.3d at 29; *see also Revere*, 463 U.S. at 244 ("The Due Process Clause . . . require[s] the responsible government or governmental agency to provide medical care to persons, such as Kivlin, who have been injured while being apprehended by the police."). Therefore, because the Plaintiff was merely an arrestee, and not a sentenced prisoner, his claim is properly brought as a violation of his Fourteenth Amendment rights.

Here, the Plaintiff was not a convicted prisoner, but an arrestee being held by the police. Nevertheless, "it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (citing *Revere*, 463 U.S. at 244 ("[T]he due process rights of a . . . [pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner." (internal citations and footnote omitted)).

A plaintiff alleging deliberate indifference to medical needs must satisfy two prongs: an "objective prong" showing that "the alleged deprivation [was] sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain, existed," *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)), and a "'*mens rea* prong,' or 'mental element prong'—showing that the officer acted with at least deliberate indifference to the challenged conditions." *Darnell*, 849

F.3d at 29.  Prior to *Darnell*, the second prong was assessed subjectively in claims brought under both the Eighth and Fourteenth Amendments.  *See Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) ("The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care."); *Caiozzo*, 581 F.3d at 70 ("[T]he standard for deliberate indifference is the same under the Due Process Clause of the Fourteenth Amendment as it is under the Eighth Amendment.").

However, in light of the Supreme Court's ruling in *Kingsley v. Hendrickson*, — U.S. —, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015), the Second Circuit held that in claims brought pursuant to the Fourteenth Amendment:

> the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety. In other words, the "subjective prong" (or "*mens rea* prong") of a deliberate indifference claim is defined objectively.

*Darnell*, 849 F.3d at 35.  Therefore, the "*mens rea* prong of a deliberate indifference claim brought by a pretrial detainee is now to be assessed objectively."  *Davis v. McCready*, — F. Supp. 3d —, No. 1:14-CV-6405-GHW, 2017 WL 4803918, at *5 (S.D.N.Y. Oct. 23, 2017) (citing *Darnell*, 849 F. 3d at 35; *Lloyd v. City of N.Y.*, 246 F. Supp. 3d 704, 719 (S.D.N.Y. 2017)).

**3. Application to the Plaintiff's Claims**

**a. As to the Claims Against the SCPD and the TSPP**

The Plaintiff cannot sustain his claims against the SCPD and the TSPP because those agencies are administrative arms of the respective municipalities.

"Under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued."  *Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463, 477 (E.D.N.Y. 2002) (Spatt, J.)

(citing *Hall v. City of White Plains,* 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002) (dismissing claim against the police department); *Polite v. Town of Clarkstown,* 60 F. Supp. 2d 214, 216 (S.D.N.Y. 1999); *Umhey v. Cty. of Orange,* 957 F. Supp. 525, 530–31 (S.D.N.Y. 1997); *Wilson v. City of N.Y.,* 800 F. Supp. 1098, 1101 (E.D.N.Y. 1992)).

Accordingly, the Defendants' motion for summary judgment pursuant to Rule 56 dismissing the claims against those entities is granted.

### b. As to the Claims Against Suffolk and Smithtown

Smithtown and Suffolk contend that the Plaintiff cannot establish municipal liability because there is no underlying constitutional violation. They further argue that the Plaintiff has not presented any evidence that any alleged constitutional injury was the result of a policy, practice or custom. The Court disagrees with both points, and finds that the Plaintiff has presented enough evidence for the Court to find that there are sufficient material questions of fact as to whether he was denied medical care under Section 1983; and as to whether that denial was the result of a failure to train by Suffolk and Smithtown.

### i. As to Whether the Plaintiff Was Denied Medical Care

### A. The Objective Prong

The Plaintiff told the officers that he had taken nine diazepam pills, two tabs of acid, and smoked some marijuana. He was asleep when they found him. Rangers Paterson and Sokol observed vomit on the seat. They were so concerned about him that they had him sit down. When he arrived at the Fourth Precinct, he was unsteady on his feet; had slurred speech; and was lethargic. Rangers Sokol and Paterson informed Sergeant Healy of the SCPD that the Plaintiff admitted to taking a large quantity of drugs. By the time the rangers attempted to drop him off at home, his daughter said that he looked like a zombie. Neither the TSPP rangers nor the SCPD

officers ever gave him medical attention. These facts, coupled with the officers' knowledge that the Plaintiff had ingested a large quantity of drugs, indicate that the officers may not have acted reasonably in response to the Plaintiff's sufficiently serious medical situation.

While it is true that "[t]he Constitution does not require an arresting police officer or jail official to seek medical attention for every arrestee or inmate who appears to be affected by drugs or alcohol," *Burnette v. Taylor,* 533 F.3d 1325, 1333 (11th Cir. 2008); *see also Estate of Lawson ex rel. Fink v. City of Hamilton,* No. C–1–07–927, 2009 WL 1444556, at *16 (S.D. Ohio May 21, 2009) ("The Constitution does not require an officer to provide medical assessment and care to every intoxicated person he arrests, regardless of the degree of impairment."), the officers were aware that the Plaintiff had ingested a dangerously large amount of drugs. He told them he had taken nine diazepam and two tabs of acid, and that he had smoked some marijuana. Ranger Paterson knew that the pills were not prescribed to the Plaintiff. (Paterson Dep. at 45 ("When I brought [the Plaintiff] to the precinct I had the pill bottles that he had in the vehicle that were not assigned to him.")).

The court in *Bradway v. Town of Southhampton*, 826 F. Supp. 2d 458 (E.D.N.Y. 2011), faced with a factually similar situation in which the defendant officers observed the plaintiff ingest a large amount of cocaine, summarized the case law regarding denial of medical treatment where a plaintiff ingested drugs as follows:

> the Court is obviously not suggesting . . . that a medical indifference claim will potentially lie simply because officers fail to take every intoxicated arrestee to the hospital at the time of the arrest for treatment. Such a rule would be absurd and, given the number of arrestees who are intoxicated at the time of arrest, would turn hospitals into arrest processing centers. . . . Instead, much more evidence must be present for a plausible constitutional violation to exist and for a medical indifference claim of this nature to survive summary judgment. In particular, there generally must be evidence that the officers are aware of the ingestion of large quantities of drugs or other intoxicants which, due to the quantities, pose a serious

or life-threatening danger to the arrestee, and/or there were obvious signs of distress from the ingestion.

826 F. Supp. 2d at 471–72.

Here, such evidence is present for the Court to find that a plausible constitutional violation exists. Rangers Paterson and Sokol were aware of the ingestion of a large quantity of drugs, which, due to the quantity, may have posed a serious and life-threatening danger to the Plaintiff. Furthermore, there were obvious signs of distress: the Plaintiff had fallen asleep; he had vomited in the car; his speech was slurred; he was unsteady on his feet; he was lethargic; and by the time he arrived home, he looked like a "zombie." In such situations, courts have been reluctant to grant summary judgment to defendants. *See Border v. Trumbull Cnty. Bd. of Comm'rs,* 414 F. App'x 831, 838 (6th Cir. 2011) ("In the instant case ... viewing the evidence in the light most favorable to plaintiffs, [the officer's] notation on the altered forms that [detainee] appeared to be 'under the influence of barbiturates, heroin or other drugs' and suffered a recent head injury, coupled with [the detainee's] signs of physical incapacity, severe intoxication and obvious disorientation witnessed by the inmates during the period [the officer] was interacting with [the detainee], sufficiently establish from an objective standpoint that a serious medical need existed and, in addition, that a reasonable jury could conclude that [the officer] was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed] and [he] ignored that risk.'") (quoting *Blackmore v. Kalamazoo Cnty.,* 390 F.3d 890, 899 (6th Cir. 2004)); *Dean v. City of Fresno,* 546 F Supp.2d 798, 814 (E.D. Cal. 2008) ("A rational[] jury could find the officers' conduct to be a form of inaction that amounts to deliberate indifference. Although the officers maintain that they only thought that [the detainee] had cocaine in his mouth, that they did not think that [the detainee] needed medical care, and that if [the detainee] had said he had swallowed cocaine that they would have obtained medical aid, a rationale [sic] jury could look at the totality

of the circumstances and conclude that the officers had actual knowledge that [the detainee] had swallowed cocaine and were deliberately indifferent to [the detainee's] condition."); *Bradway*, 826 F. Supp. 2d at 469–70 (finding that the plaintiff met the objective prong where the officers observed him ingest cocaine, and he admitted to them that he ingested up to three grams of cocaine); *see also Iacovangelo v. Correctional Medical Care, Inc.*, 624 F. App'x 10, 13 (2d Cir. 2016) (holding that, on a motion to dismiss, the plaintiff plead sufficient facts alleging that she suffered from a serious medical condition after she acknowledged she was under the influence of drugs and had a history of drug abuse upon admission to county jail); *McConville v. Montrym*, No. 3:15-cv-00967 (MAD/DEP), 2016 WL 3212093, at *5 (N.D.N.Y. June 9, 2016) (holding that the plaintiff's complaint withstood a motion to dismiss where "the complaint alleges that Decedent swallowed a toxic amount of oxycodone, smelled strongly of alcohol, was covered in urine, and exhibited numerous presenting symptoms of overdose and intoxication, including incoherency, motor impairment, dizziness, vomiting, impaired coordination, confusion, and trouble breathing. Decedent also made repeated requests to be taken to a hospital. Construing the facts in the light most favorable to Plaintiff, such allegations plausibly plead a serious medical condition under the objective prong of the deliberate indifference analysis." (internal citations omitted)); *Vining v. Dep't of Corr.*, No. 12 Civ. 3267 (JPO), 2013 WL 2036325, at *5 (S.D.N.Y. Apr. 5, 2013) (stating, in dicta, that a plaintiff's situation would appear urgent where the officers knew that he had ingested a dangerous amount of alcohol or drugs (citing *Bradway*, 826 F. Supp. 2d at 471)).

The Defendants rely almost entirely on the fact that the Plaintiff consistently refused medical attention. However, this fact alone does not mean that the officers acted reasonably in response to the Plaintiff's situation. Namely, it does not change the conclusion that Rangers Sokol and Paterson were aware that the Plaintiff had placed himself in a life-threatening situation by

ingesting a large quantity of drugs. *See, e.g., Bradway*, 826 F. Supp. 2d at 473 (stating that "the Court has conducted independent research and carefully examined other cases that have dealt with the ingestion of drugs in the medical indifference context. In many of the cases that grant summary judgment for the defendants, the defendants were unaware of the actual amount of drugs consumed and/or the plaintiff exhibited no signs of distress." (collecting cases)). Here, the Plaintiff told the rangers that he had taken nine diazepam that were not prescribed to him, two tabs of acid, and smoked some weed; they observed vomit in the car; and he was unsteady on his feet and slurred his speech.

Although it is true, as the County points out, that the Plaintiff did not introduce any medical evidence to support the contention that his ingestion of drugs created a sufficiently serious question, in the Court's opinion, such expert testimony is not necessary to create a question of fact. The inherent danger of ingesting a large quantity of prescription drugs mixed with other narcotics is something that is "obvious or common in everyday life," *Palmer v. Sena*, 474 F. Supp. 2d 347, 350 (D. Conn. 2007), and arguably "dwells within the common knowledge of a layperson," *Gold v. Dalkon Shield Claimants Tr.*, No. B-82-383 (EBB), 1998 WL 351456, at *3 (D. Conn. June 15, 1998), aff'd, 189 F.3d 460 (2d Cir. 1999). While the Plaintiff may require such expert testimony at trial to prove his case, the Court finds that the mere ingestion of a large quantity of a mixture of narcotic drugs, coupled with the apparent signs of distress, are sufficient evidence to create a question of fact as to whether there was a sufficiently serious situation that could lead to serious injury or death.

Finally, the evidence is clear that the officers never took the Plaintiff to a hospital. The Plaintiff did not receive medical attention until his wife called 911. Therefore, there is a question of fact as to whether they acted reasonably in response to the Plaintiff's sufficiently serious

situation. The evidence is clear that the Plaintiff was in a sufficiently serious situation. He was in a coma for six days, and has serious medical residuals. While there is no evidence that the delay in medical treatment caused or exacerbated his condition, the Defendants did not raise that issue, and the Court therefore declines to address it.

Therefore, the Court finds that the Plaintiff has introduced sufficient evidence to create a question of fact as to whether he suffered a medical deprivation that was sufficiently serious. The Defendants' motions for summary judgment on that basis are denied.

## B. The *Mens Rea* Prong

Similarly, the Court finds that there is a question of material fact as to whether officers from both the TSPP and the SCPD "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the [Plaintiff] even though the [officers] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.

"[F]ollowing *Darnell*, the Court is faced with a difficult task. It is called upon to determine, without the benefit of medical expertise, whether an objectively reasonable person in Defendant[s'] position would have known, or should have known, that Defendant[s'] actions or omissions posed an excessive risk of harm to [the Plaintiff]." *Davis*, 2017 WL 4803918, at *8. Here, the Court finds that there is a question of fact as to whether an objectively reasonable person in the officers' position would have known, or should have known, that failing to bring the Plaintiff to the hospital posed an excessive risk of harm to the Plaintiff.

As stated above, Rangers Paterson and Sokol knew that the Plaintiff had ingested a dangerous amount of narcotic drugs. Ranger Paterson knew that the prescriptions drugs he took were not prescribed to him. They told Sergeant Healy of the SCPD how much the Plaintiff claimed to have ingested. (*See* Paterson Dep. at 60 ("[W]as there any conversation about what [the

Plaintiff] said he had ingested at that point? Yes, there was. I explained to the sergeant what he had told me and that's when the sergeant asked his questioning [sic] about medical to make sure that, you know, Mr. Boston was okay.")). All three officers knew that the Plaintiff was at risk, and they asked if he needed medical attention. As At the very least, they should have known that the ingestion of a large quantity of drugs placed the Plaintiff in a serious situation.

Moreover, the Plaintiff exhibited outward signs of distress that put the officers on notice. He was asleep when Rangers Sokol and Paterson found him; there was vomit in the car; he was unsteady on his feet when he exited the car, and when he was brought into the precinct; Sergeant Healy noted that he was lethargic and had slurred speech; and Ranger Paterson testified that "he had a little bit of trouble moving . . . ." (Paterson Dep. at 66). Under these circumstances, coupled with the officers' knowledge of the Plaintiff's ingestion of drugs, a reasonable juror could find that the officers recklessly failed to act.

Courts have held that officers were aware of, and arguably disregarded, a substantial risk that serious harm would result where they knew that the arrestee ingested drugs and the arrestee exhibited outward signs of distress. *See Iacovangelo,* 624 F. App'x at 13 (holding, in a motion to dismiss, that the defendant was aware of detainee's drug withdrawal and intoxication during a medical screening where the defendant was aware of the detainee's drug history, a "visual assessment" of the detainee indicated that she was under the influence of drugs, and the detainee was observed vomiting); *Border*, 414 F. App'x at 838 (holding that an officer's observation of a detainee's signs of physical incapacity, severe intoxication and obvious disorientation were sufficient under the subjective prong to establish the officer's awareness of the detainee's condition); *Bradway*, 826 F. Supp. 2d at 472 (finding that the officers were aware of a detainee's medical condition and disregarded a substantial risk of harm where the officers witnessed the

detainee's drug consumption, he told the officers of his drug consumption and he displayed signs of distress); *Wilson v. City of New Haven*, No. NNHCV106010876, 2017 WL 2111375, at *4 (Conn. Super. Ct. Apr. 19, 2017) (applying *Darnell*, finding that there was a question of fact as to the plaintiff's medical indifference claim where the plaintiff "began to show signs of discomfort with crack residue coming out of the corner of his mouth. He was fainting, his speech became slurred, and he complained that he felt weak and his stomach hurt. Johnson told the officers that Wilson needed to go to the hospital," and the officers knew that the plaintiff had bags of cocaine in his mouth).

Finally, the Court cannot say as a matter of law that the officers did not act recklessly in failing to provide the Plaintiff with medical care. While it is true that the Plaintiff repeatedly declined medical treatment, "[t]here are certainly circumstances where an intoxicated person's statement that he or she does not need medical treatment should not be honored because it is inconsistent with other objective facts indicating that hospitalization is clearly necessary." *Bradway*, 826 F. Supp. 2d at 473–74.

Therefore, the Plaintiff has shown that there is a question of fact as to whether Rangers Paterson and Sokol, and Sergeant Healy "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the [Plaintiff] even though the[y] []knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. Accordingly, the Court finds that there is a question of fact as to whether the Plaintiff suffered a constitutional injury, and the Court turns to the Plaintiff's *Monell* claims.

### ii. As to Whether the Plaintiff's Constitutional Injury Was the Result of a Failure to Train by Suffolk and/or Smithtown

The Plaintiff argues that a question of fact remains as to whether Suffolk and Smithtown failed to adequately train their officers, and that a rational juror could find that they should be held

liable for the Plaintiff's constitutional injuries.  In opposition, Suffolk and Smithtown contend that the Plaintiff's complaint alleges that the municipalities' liability is premised upon a custom, policy, usage, practice, procedure, or rule, and that the Plaintiff has failed to produce any evidence that his injury was the result of a custom, practice, or policy.  The Court, in its discretion, reads the complaint broadly to include a claim for failure to train and finds that the Plaintiff has introduced sufficient evidence for the Court to submit his *Monell* claims to the jury.

As to the wording of the claim, while it is true that in the complaint, the Plaintiff bases his *Monell* claim on "customs, policies, usages, practice[s], procedures and rules" of the respective municipalities, a failure to train is in itself a type of policy.  *See Connick*, 563 U.S. at 61 ("[A] local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983.").  Furthermore, in his state law claims, the Plaintiff alleges that the municipalities failed to properly train and supervise their agents.  Therefore, the Court reads the Plaintiff's complaint broadly to include a *Monell* claim for failure to train, because a failure to train can amount to a municipal policy in certain circumstances.

As to the substance of the claim, the Plaintiff introduced, through deposition testimony, that Rangers Sokol and Paterson had never received any training from Smithtown on how to identify drugs; how drugs affect people; how to deal with individuals who are clearly in medical distress; or how to interact with arrestees.  Sergeant Healy testified that he never received any training from Suffolk regarding how drugs affect people.  He further testified that a desk officer only needed to know when a prisoner had ingested a foreign substance if the ingestion was part of a suicide attempt.

The Plaintiff has not introduced any evidence of "[a] pattern of similar constitutional violations" as is "ordinarily necessary to show deliberate indifference for purposes of failure to train." *Connick,* 563 U.S. at 62 (internal citation and quotation marks omitted). However, in the Court's opinion, he has introduced sufficient evidence of deliberate indifference based on a single-incident theory.

Namely, the facts show that both Suffolk and Smithtown knew "to a moral certainty," *Walker,* 974 F.2d at 297, that officers would encounter arrestees who had ingested drugs and would require medical attention. Paterson and Sokol both testified that they had encountered many individuals under the influence of drugs. Paterson said that many people went to the park specifically to do drugs. Sergeant Healy testified that he had encountered individuals under the influence of narcotics. More generally, officers, including those employed by the Suffolk County Police Department and the Town of Smithtown Park Police, encounter individuals who possess, or have recently used narcotic drugs.

The situation in this case—whether or not to bring the Plaintiff to the hospital after he ingested a large quantity of drugs but refused medical attention—"present[ed] the [officers] with a difficult choice of the sort that training . . . w[ould] make less difficult . . . ." *Id.* That is, if Rangers Sokol and Paterson and Sergeant Healy had been trained on the effects of drugs on individuals, they would similarly not have faced a difficult choice. And a "highly predictable consequence" of officers making the wrong choice in such a situation, *Connick*, 563 U.S. at 64, would result in violations of arrestees' constitutional rights. Said differently, if other officers responded in the same way as Rangers Sokol and Paterson and Sergeant Healy did, then other arrestees' constitutional rights would also likely be violated. Therefore, the consequences of Suffolk and Smithtown's failure to train "are so patently obvious that [a rational juror could find

that they] should be liable under [Section] 1983 without proof of a pre-existing pattern of violations." *Id.*

Other courts have found that similar single-incident claims survive motions for summary judgment or motions to dismiss. *See Gerskovich v. Iocco*, No. 15 CIV. 7280 (RMB), 2017 WL 3236445, at *10 (S.D.N.Y. July 17, 2017) (denying summary judgment on the plaintiff's single-incident *Monell* claim where he alleged that his injuries were due to New York City's failure to train its police officers on the rights of protestors); *Edrei*, 254 F. Supp. 3d at 581 (finding that the plaintiff's single-incident *Monell* claim withstood a motion to dismiss where the plaintiff alleged that the City of New York should have trained its police officers in the use of Long Range Acoustic Devices in crowd control situations); *Waller v. City of Middletown*, 89 F. Supp. 3d 279, 284–86 (D. Conn. 2015) (finding that the plaintiff's complaint stated a claim upon which relief could be granted for a single-incident *Monell* violation where officers damaged the plaintiff's home during a search and the plaintiff alleged that the city "failed to train its Officers to understand that entry into a private home to execute an arrest warrant, but without a search warrant and without exigent circumstances, is illegal *per se*"); *Prevost v. City of N.Y.*, No. 13-CV-3760 VEC, 2014 WL 6907560, at *7 (S.D.N.Y. Dec. 9, 2014) (denying the City's motion to dismiss based on single-incident theory where police officers allegedly received no training on the role exculpatory evidence plays in determining probable cause); *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 393 (S.D.N.Y. 2013) (denying the City of White Plains' motion to dismiss where the complaint plausibly alleged a single-incident *Monell* violation based on the theory that the city failed to train officers of the White Plains Police Department on how to deal with emotionally disturbed persons).

While some courts have read *Connick* to define the requirements for succeeding on a single-incident theory so narrowly as to eviscerate it, other courts have read the Supreme Court ruling to permit single-incident theory under certain circumstances. *See Waller*, 89 F. Supp. 3d at 285 (collecting cases that "have not read the Supreme Court's ruling as foreclosing single-incident liability under appropriate circumstances"). This Court agrees with the logic and reasoning of those cases that have found that single-incident theory survives *Connick* under certain circumstances, such as those found here. In any event, neither Suffolk nor Smithtown move for summary judgment on the basis that the Plaintiff cannot proceed under single-incident theory.

Therefore, the Court finds that there is a material issue of disputed fact as to whether the Plaintiff's injuries were caused by Suffolk and Smithtown's failure to train their officers on the effects of drugs on individuals and how to interact with arrestees. Accordingly, the Defendants' motion for summary judgment pursuant to Rule 56 dismissing those claims is denied.

### 4. As to the Plaintiff's State Law Claims

Suffolk and Smithtown both summarily claim that the Plaintiff failed to comply with the requirements of N.Y. GEN. MUN. LAW § 50-e(1). They do not present any case law in support of this contention, nor do they attempt to show why the Plaintiff's notice of claim was insufficient. Their respective arguments on the issue are each one sentence long. (*See* Suffolk Cty.'s Mem. of Law in Support of Mot. at 23 ("The defendants respectfully request, in light of a lack of a viable federal claim that the Court decline jurisdiction of the plaintiffs state claims, or in the alternative, dismiss them for the plaintiff's failure to comply with the provisions of the General Municipal Law 50-e(1)."); Smithtown Mem. of Law in Support of Mot. at 23 ("In addition . . . the negligence claim is barred by non-compliance with the conditions precedent to suit provide[d] for in the New York General Municipal Law Section[s] 50-e, 50-h, and 50-i.")). In a motion for summary

judgment, the defendant bears the initial burden of showing the absence of genuine issues of material fact. *Celotex Corp.*, 477 U.S. at 323. The Plaintiff served a notice of claim on both Suffolk and Smithtown within ninety days of the date of his alleged injury, complying with the most basic requirement of N.Y. Gen. Mun. Law 50-e. It is not clear from the Defendants' papers why the notice was insufficient, or why summary judgment should be granted on the Plaintiff's state law claims. Therefore, the Court declines to do the Defendants' work for them, and their motion to dismiss the Plaintiff's state law claims pursuant to Rule 56 is denied.

### III. CONCLUSION

For the reasons stated above, the Plaintiff's motion to amend his complaint pursuant to Rule 15 is denied; and the Defendants' motions for summary judgment are granted in part and denied in part. The motions for summary judgment are granted to the extent that the SCPD and TSPP are administrative arms that cannot be sued separate and apart from their respective municipalities and the claims against them are therefore dismissed. The motions for summary judgment are denied to the extent that the Plaintiff's *Monell* claims and state law claims against Suffolk and Smithtown shall be presented to the jury.


It is **SO ORDERED:**

Dated: Central Islip, New York

January 9, 2018

_____*/s/ Arthur D. Spatt*_____

ARTHUR D. SPATT

United States District Judge